Timothy Devlin (*pro hac vice* forthcoming)
tdevlin@devlinlawfirm.com
Lowell D. Jacobson (*pro hac vice forthcoming*)
ljacobson@devlinlawfirm.com
**DEVLIN LAW FIRM, LLC**
1526 Gilpin Avenue
Wilmington, Delaware 19806
Tel: (302) 449-9010 Fax: (302) 353-4251

Tamara D. Fraizer (*pro hac vice* forthcoming)
tamara.fraizer@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
1841 Page Mill Road, Suite 110
Palo Alto, California 94304
Tel: 650 856 6500  Fax: 650 454 8777

Marc J. Gross
mgross@foxrothschild.com
Jordan B. Kaplan
jbkaplan@foxrosthschild.com
**FOX ROTHSCHILD, LLP**
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

*Attorneys for Plaintiff Happy Products, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAPPY PRODUCTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> BOSCOV'S DEPARTMENT STORE, LLC; BJ'S WHOLESALE CLUB, INC.; AND UNBEATABLESALE.COM, INC., <br><br> Defendants. | Civil Action No. _____ <br><br> **COMPLAINT FOR PATENT INFRINGEMENT, TRADE DRESS INFRINGEMENT, AND UNFAIR COMPETITION.** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Happy Products, Inc. ("Plaintiff" or "HPI"), by and through its undersigned counsel, files this Complaint against Defendants Boscov's Department Store, LLC ("Boscov's"); BJ's Wholesale Club, Inc. (BJ's"); and Unbeatablesale.com, Inc. ("UBS") (collectively, "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1.      This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, the federal Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, and the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4-1, for Defendants' acts relating to their sale, offer for sale,

distribution, marketing, advertising, and use in the United States of the Pillow Pad or Pill-O-Pad media support device (hereinafter, "Pillow Pad") provided by Ontel Products Corp. ("Ontel"). Pillow Pad is a knock-off copy of HPI's visually distinct and patented Flippy® or Flipy® tablet pillow stand (hereinafter, "Flippy") that has been distributed throughout the United States online and at virtually all major retailers, including Defendants, and used to sell other and inferior media support products, to the detriment of consumers and Plaintiff HPI.

2.      Shown below are HPI's Flippy (left) and Ontel's knock-off Pillow Pad product (right).  As shown in the diagram below them, the Flippy and the Pillow Pad each provide three different viewing angles for a supported media.  Each of the three viewing angles is obtained by flipping the device to rest upon each of its three sides.



3.      HPI's claims against Ontel are currently pending in related case No. 2:24-cv-09819-EP-JRA.

4.      By virtue of this action, HPI seeks monetary damages and a preliminary and/or permanent injunction that prohibits each Defendant and its principals from importing, marketing,

advertising, selling and/or offering to sell the knock-off Pillow Pad product (including any substantially similar product, whether or not so marked) in the United States, and that further prohibits Defendants and their principals from assisting any other entity with doing the same.

## NON-PARTY ONTEL

5.     On information and belief, Ontel Products Corporation was founded by Ashok (aka "Chuck") Khubani in 1994, and offers "As Seen on TV" products including the Pillow Pad, which is indicated at www.asseenontvlive.com/best-sellers/ to be a "best seller."

6.     On information and belief, Ontel is a family-owned New Jersey corporation with its principal place of business at 21 Law Drive, Fairfield, New Jersey, 07004.

7.     Chuck Khubani is the founder, owner, and CEO of Ontel and a resident of New Jersey.

8.     On information and belief, Chuck Khubani was personally and directly involved in all aspects of the business of Ontel during at least the 2018–2019 period and through approximately summer of 2022.

9.     Chuck Khubani is the brother of AJ Khubani, the CEO of Telebrands, another family-owned "As Seen On TV" direct response company.

10.     Amar Khubani is the President of Ontel and a resident of New Jersey.

11.     On information and belief, Amar Khubani is personally and directly involved in all aspects of the business of Ontel.

12.     Amar Khubani is Chuck Khubani's son and AJ Khubani's nephew.

## THE PARTIES

13.     Plaintiff Happy Products, Inc. ("HPI") is a small woman-owned business that invented, developed, and continues to market and sell the Flippy.

14.     Happy Products, Inc. is a Delaware corporation located in Portland, Oregon.

15.    On information and belief, Defendant Boscov's Department Store, LLC is a Delaware entity with its corporate headquarters located at 4500 Perkiomen Ave., Reading, PA, 19606.

16.    On information and belief, Defendant BJ's Wholesale Club, Inc., is a Delaware corporation with its corporate headquarters located at 350 Campus Drive, Marlborough, MA 01752.

17.    On information and belief, Defendant Unbeatablesale.com, Inc. is a New Jersey corporation with its corporate headquarters located at 195 Lehigh Ave., Ste. 5, Lakewood, NJ, 08701.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a)–(b) under the patent laws of the United States, 35 U.S.C. §§ 100, *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1051, 1121.  This Court also has subject matter over this action pursuant to 28 U.S.C. § 1367(a) for the claims arising under the New Jersey Unfair Competition Act, N.J. Stat. Ann. § 56:4-1.

19.    On information and belief, Defendant Boscov's is subject to the general personal jurisdiction of this Court based on its continuous and systematic activities in New Jersey that include but are not limited to the eight Boscov's department stores operating in the state of New Jersey.  See https://locations.boscovs.com/nj/ .

20.    On information and belief, Defendant BJ's is subject to the general personal jurisdiction of this Court based on its continuous and systematic activities in New Jersey that include but are not limited to the twenty-five BJ's club locations operating in the state of New Jersey.  See https://www.bjs.com/clubLocator .

21.    On information and belief, Defendant UBS is subject to the general personal jurisdiction of this Court based on its continuous and systematic activities in New Jersey that include its incorporation, business location, and operation in the state of New Jersey.

22.    On information and belief, this Court has personal jurisdiction over Defendant UBS because UBS is a corporation formed under the laws of New Jersey whose principal place of business is located in this District.

23.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to Boscov's because Boscov's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against Boscov's occurred in this District.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to BJ's because BJ's has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against BJ's occurred in this District.

25.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to UBS because UBS resides in this District, because UBS has a regular and established place of business in this District and has committed acts of patent infringement in this District, and because a substantial part of the events or omissions giving rise to the claims against UBS occurred in this District.

**THE BUSINESS AND BUSINESS MODEL OF ONTEL**

26.    Ontel is infamous for a pattern of copying successful proprietary products and seeking to piggyback on the innovations of others by selling "knock-off" products (often made in China), which are then imported into the United States.

27.    Ontel promotes and offers for sale products online and through national direct response television commercials (aka "infomercials"), as well as various retail outlets.

28.    Ontel also markets and sells products at the retail level through well-known retailers.  For Ontel, these retailers have comprised Amazon (including its Woot.com sub-brand), Target Stores, BJ's Wholesale Club, Boscov's, Kroger's (and various other brands operated by Kroger's, including but not limited to Fred Meyer), Meijer, Big Lots, Ollie's Bargain Outlets,

Walmart, Ace Hardware, Rite Aid, the JoAnn Stores, Lowe's, Bed Bath & Beyond, CVS, and Walgreens.

29.     A fuller description of Ontel's business model, as well as its development of the knock-off Pillow Pad product after ordering dozens of Flippys, is set forth in detail in HPI's Amended Complaint in *Happy Products, Inc. v. Ontel Prods. Corp.*, Civil Action No. 2:24-cv-09819-EP-JRA, Dkt. No. 60, at ¶¶ 37–58, & 122–54.

<b>THE PATENTED MEDIA SUPPORT</b>

30.     U.S. Patent No. 9,642,454 ("the '454 patent"), titled "Multiple Viewing Angle Media Support," was duly issued to inventors Bruce Cannon and Juliette Fassett.

31.     The '454 patent describes a media support apparatus that includes three support sides (155) that can be disposed about a central axis (125), each side having a support back (105) and support edge (110), where the top of each back support is in physical communication with the edge support of another side, as shown in Figure 1 (included below).



FIG. 1

32.     The application that eventually matured into the '454 patent was filed on June 24, 2016, claiming priority to an application filed on October 20, 2014; the '454 patent issued on May 9, 2017, with ten (10) claims.

33.     Claim 1, like every claim of the '454 patent, is directed to "[a]n apparatus comprising: three support sides, each support side comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support clockwise about a central axis and each back support and each edge support is in physical communication with two ends of a solid interior" where the plane of each back support is at a particular angle to a specified "virtual plane," providing three specified "viewing angles," and "wherein each back support, each edge support, and each end is a surface of the solid interior [and] the solid interior is a pillow covered in fabric."

34.     A true and correct copy of the '454 patent is attached as **Exhibit A**.

35.     U.S. Patent No. RE48,479 ("the '479 patent") is a reissue of the '454 patent that issued on March 23, 2021.

36.     The '479 patent has the same figures, title, and descriptions as the '454 patent and includes the same ten (10) claims as the '454 patent, as well as nineteen (19) additional claims.

37.     Claim 12 of the '479 patent, for example, is directed to a "media support apparatus comprising: a body having a first support back, a second support back, and a third support back disposed about a central axis" where each support edge is "disposed between" two support backs, wherein "the media support apparatus is configured to be rotated about the central axis so that the body can rest on a horizontal support in any one of three positions …" and provides three "viewing angles" that are different from one another.

38.     A true and correct copy of the '479 patent is attached as **Exhibit B**.

39.     HPI is the owner under applicable law and by assignment of all right, title, and interest in the '454 and '479 patents, including the rights to sue, recover damages and obtain equitable relief for the patents' infringement.

## JULIETTE AND BRUCE DESIGN AND DEVELOP FLIPPY

40.     Juliette Fassett and her husband Bruce Cannon co-invented the patented "multiple viewing angle media support" disclosed and claimed in the '454 and '479 patents.

41.     Juliette Fassett is a repeat entrepreneur who has founded multiple businesses since she was in her 20s.  Her interest in consumer products was honed by her having lived and worked in Japan and experiencing its cultural focus on excellence in design and attention to detail.  In particular, while working at Toyota Chuo Kenkyuusho (Toyota's think-tank), Juliette came to understand the concept of "*ii kanji*"—which is defined as something like "good function or feeling" and further connotes the idea of exceeding expectations.

42.     Juliette's husband and co-inventor, Bruce Cannon, is an optical engineer and scientist with 35 years of experience designing optical systems—primarily sighting equipment for military applications, but also for consumer products.  One notable contribution is Bruce's thermal imaging work on the FLIR Star SAFIRE, which is a gyro-stabilized electro-optical infrared system most often used in airborne, land, and maritime force protection and medevac operations.  This system was famously instrumental in the capturing of Boston Marathon bomber Dzhokar Tsarnaev by Massachusetts State Police in 2013.

43.     Juliette and Bruce are the named co-inventors on the Flippy patents, and between them, are the named inventors on 13 patents.

44.     Circa 2011, there were very few tablet stands that could hold a tablet or iPad in a perfect reading position both comfortably and without the user's assistance.  Most of the available tablet stands were made of hard metal and/or plastic and required support from the user.

45.     So Juliette spent 2 years researching, thinking, drawing, examining, messing with, building and taking apart tablet stands.  She formulated many ideas about what she thought would work and what was missing in the marketplace.

HPI V. NJ RETAILERS COMPLAINT

46.    With Bruce's input, they were able to realize their concept of a soft but supportive stand that would provide multiple reading angles—appropriate for multiple positions such as sitting, standing, and lying down—with the flip of the wrists.

47.    Juliette and Bruce had CAD drawings prepared for the Flippy as part of the design and development process.

48.    In particular, the geometry and trigonometry of the Flippy is something that Juliette and Bruce worked on for 18 months before settling on the design.  The optical angles for viewing (the trigonometry part) needed to achieve appropriate depth-of-focus and take into account brightness degradation and eye relief—all while meshing perfectly with the support aspect of having the Flippy on the viewer's body (the geometry part) because one primary use is for when the viewer is lying down (e.g., in bed or on the couch).

49.     Juliette and Bruce filed their provisional patent application on Flippy in 2013, and their initial patent issued in 2017.

50.    The Flippy has three support sides, each comprising a back support and an edge support, wherein a top of each back support is in physical communication with an adjacent edge support, and each edge is "disposed between" two support backs—as variously recited in the claims of the '454 and '479 patents.

51.    The claims of the '454 and '479 patents do not, however, specify how any back support is "in physical communication with" any edge support, or how any edge support is "disposed between" two back supports.

52.    The Flippy is and always has been characterized by rounded bumper-like shapes between each back support and the next edge support, as shown in the image below.



53.    Juliette knew that her Flippy had to have a certain "*ii kanji*," so she specifically included these rounded ledges for the lip of the media support in her design for the otherwise prism-like device, which evoke waves rolling onto a beach.



54.     Without these signature rounded ledges, a media support device would have the same functionality and satisfy the claims of the '479 patent, but it would appear weapon-like. Specifically, it would look like a "ninja star" or shuriken when viewed from the side, as above, which would not reflect the proper "*ii kanji*" of the product she sought to create.  In other words, it would not be Flippy, or even be like Flippy.

55.     Juliette has always viewed these rounded ledges as a signature aesthetic feature of her design.

56.     Throughout the design iteration process and manufacturing of Flippy, Juliette insisted on maintaining these signature rounded ledges to her precise personal standards of roundedness to produce the right "*ii kanji*" for Flippy

57.     Even back from the earliest days of designing what would become the Flippy in November 2011, Juliette remarked that one proposed product design was "just to[o] sharp" and that she and Bruce "ha[d] to go back to rounding the design."  When viewing a revised design two days later, Juliette again remarked that "we need to round out the [l]edges much, much more."

58.      Juliette refused to compromise on her standards of roundedness for the rounded ledges throughout the product lifecycle, including during manufacturing.

59.     As another example of her commitment to Flippy's "*ii kanji*," Juliette spent months working on indentation force deflection alone in order to determine the optimal foam to use for Flippy.

60.     Overall, each design element of the Flippy product was the result of an exhaustive process of iteration and research on design and material decisions informed by Juliette's and Bruce's decades of experience.

61.     Juliette was determined to create the perfect multi-angle tablet stand and was meticulous in her process of developing Flippy.  The only corners she cut were literal—to form Flippy's signature rounded ledges.

62.    The distinct look and shape of the Flippy design is shown below in its emblematic format, for which the USPTO award HPI registered trademark No. 7,437,967 in 2024.



63.    Juliette's development of Flippy also leveraged her keen sense of style and appreciation for marketing—calling it "Flipy" (and then "Flippy") to emphasize that the multiple angles are provided by flipping the product around its horizontal axis.

64.    Juliette then sought to register trademarks for Flipy and Flippy in order to further protect the brand that she had spent so much time and effort to develop.

### HPI'S FOUNDING AND BUSINESS

65.    Juliette founded HPI in September 2018 to attract investment to support burgeoning sales of Flippy directly to consumers through various channels.

66.    Based on large purchase orders from QVC, which were based on market tests, Juliette took private investment and formed HPI as a Delaware-registered C Corporation, issuing shares to investors.

67.    This private investment lowered the cost of capital for Juliette and HPI by making it unnecessary to seek traditional purchase order financing (at a higher cost) to fund production of the Flippy units for the QVC purchase order.

68.    Through HPI, Juliette was committed to providing a quality product from a socially conscientious business platform: HPI was and is a nationally-registered WBENC (Women's Business Enterprise National Council) business and HPI supported its literacy partner

www.firstbook.org through product sales and also helped employ developmentally challenged adults through warehouse operations.

69.    In November of 2018, Flippy sold out on QVC in a single airing: $500,000 worth of product in 12.5 minutes.  The product was a hit.  HPI's revenues in 2019 totaled $7,000,000— all from sales of Flippy.

70.    Since selling out on QVC, HPI has offered for sale and sold the Flippy continuously, including on Amazon, Etsy, Grommet, and direct-to-consumer on its own website, getflippy.com .

71.    As shown in the annotated image below, the '454 patent was at all relevant times clearly marked on a tag attached to the Flippy product itself:



72.    As shown in the annotated image below, the '454 patent was at all relevant times also clearly marked on the packaging for the Flippy product:



73.    Beginning in June 2023, all product and packaging for Flippy were marked with the '479 patent, as were all subsequent orders thereafter by HPI of Flippy product and packaging.

**ONTEL'S AND DEFENDANTS' KNOWLEDGE OF THE '479 PATENT**

74.    Ontel has known about the '454 patent since November 2018, when it purchased numerous Flippys, each of which was marked with that patent's number.  Ontel has known about the '479 patent since at least April 2021, when Amazon informed Ontel that HPI filed a complaint with Amazon's seeking to have Ontel's knock-off Pillow Pad product removed from Amazon's listings because it infringed the '479 patent.

75.    On information and belief, in June 2021, Ontel was informed by Amazon that Ontel's knock-off Pillow Pad was being de-listed from Amazon based on Ontel's failure to contest HPI's claim that the knock-off Pillow Pad product infringed the '479 patent.

76.    After the communications from Amazon in June 2021 that the Pillow Pad could no longer be sold on Amazon, and without any license from HPI, Ontel has continued to advertise, distribute, offer for sale, and sell its Pillow Pad products through channels other than Amazon, including the Defendants.

77.    On information and belief, Defendants Boscov's and BJ's were made aware of HPI's allegations that the knock-off Pillow Pad product infringes the '479 patent by letters from

HPI putting them on notice of infringement of the '479 patent due to their sales and offers for sale of knock-off Pillow Pad products sourced by Ontel.

78.    Boscov's became aware of HPI's allegations no later than June 2, 2023, when HPI's outside counsel provided actual notice via email.

79.    BJ's became aware of HPI's allegations no later than June 16, 2023, when HPI's outside counsel provided actual notice via email.

80.    Flippy was marked, on the product itself and its packaging, with the number of the '454 patent and/or the '479 patent at all relevant times.

81.    Each Defendant has at least been on constructive notice of the '454 patent and/or the '479 patent at all relevant times.

### ONTEL PROVIDES A KNOCK-OFF PRODUCT CALLED PILLOW PAD

82.    On information and belief, as of 2019, Ontel had entered into agreements with each of numerous retailers pertaining to their purchase, distribution and/or sale of one or more Ontel products.

83.    On information and belief, throughout 2019, Ontel made arrangements with numerous retailers for their purchase, distribution and/or sale of its Pillow Pad product.

84.    Throughout 2019, Ontel's Pillow Pad product was advertised on television.

85.    Ontel aired its first television advertisement for a multi-angle soft tablet product that it called the Pillow Pad in February 2019.

86.    Ontel also created a Facebook page for the Pillow Pad on February 6, 2019, as shown in these screenshots taken in March 2019:





87.     In February 2019, HPI learned of Ontel's knock-off Pillow Pad product when a friend of Juliette Fassett's saw Ontel's "As Seen on TV" late night cable advertisement, and called Juliette to tell her about it.  Shortly thereafter, HPI learned that Ontel had created a website for its knock-off Pillow Pad product, from which it was taking orders.

88.     On information and belief—based on at least the delivery of numerous grey, blue, and burgundy Flippys to Ontel's corporate address; Ontel depicting and showing its Pillow Pad product in substantially similar grey, blue, and burgundy colors; and an apparently sewn-on side pocket in the same location as the Flippy logo—at least the first advertisement for Ontel's knock-off Pillow Pad product and product depictions on Ontel's Pillow Pad 360 Facebook page did not depict anything that Ontel manufactured or had made, but instead depicted the Flippy products that were delivered from Amazon to Ontel as if they were the product that Ontel was offering for sale and selling.

89.     On information and belief, based on the response to Ontel's initial television advertising, Ontel subsequently arranged for a knock-off product to be made, consistent with its

historical business model of testing the market and only arranging for knock-off products to be manufactured if sufficient sales interest could be generated.

90.    Among the numerous misstatements in Ontel's advertisements was a claim that its knock-off Pillow Pad product had an "Innovative Ledge Design!"



https://www.youtube.com/watch?v=RrdibdsDLYw

91.    But this ledge design was no innovation of Ontel's; rather, it was copied directly from the Flippy products that were delivered to Ontel after the QVC Flippy sell-out, as was the rest of the knock-off Pillow Pad's design, right down to the colors offered.

92.    The original logo associated with the "Pillow Pad 360" advertisement also used a logo that was substantially similar to the iconic shape of HPI's innovative and distinctive Flippy product, for which HPI subsequently received a trademark registration.

93.    On information and belief, Ontel directly copied both the functional and design elements of the Flippy products that it ordered.

94.     As shown in the attached **Exhibit C**, the Pillow Pad infringes at least claim 1 of the '454 patent, at least under the doctrine of equivalents.

95.     Given that the Flippy products delivered to Ontel in late 2018 included grey, blue, and burgundy Flippys, it was no coincidence that the Pillow Pad was offered in substantially similar (if not identical) grey, blue, and burgundy colors:



Pillow Pad Tablet Stand Commercial - As Seen on TV

As Seen on TV
6.83K subscribers
Subscribe

59,421 views  Jun 29, 2019  #AsSeenOnTV

https://www.youtube.com/watch?v=RrdibdsDLYw

96.     On information and belief, at least initially, Ontel did not offer its Pillow Pad product in any colors other than those in which the Flippy was available.

97.     On information and belief, Ontel's Pillow Pad product has been made in and imported from China beginning in late 2018 and/or early 2019.

98.     Ontel's Pillow Pad product was (and continues to be) priced more cheaply than Flippy and its initial pricing was intended to drastically undercut Flippy's pricing.

99.     Flippy's pricing was based in part of its use of high-end materials specifically and meticulously selected by Juliette to convey the right "*ii kanji*."  In contrast, Ontel's knock-off Pillow Pad product was of vastly inferior quality, which allowed for its drastically lower price.

100.     Numerous reviews have remarked on the very light weight and flimsy feel of the Pillow Pad product, and the poor quality of the materials for the pad cover and the zipper.

101.     These include a video review from the "Freakin' Reviews" account on YouTube, which noted that most positive reviews of the Pillow Pad were submitted by Ontel or persons at Ontel, and demonstrated the "cheap design" of the Pillow Pad at:



https://www.youtube.com/watch?v=b4eMvA0s8zE

102.     A number of comments posted to the "Freakin' Reviews" video review of Ontel's knock-off Pillow Pad product specifically noted its inferior quality as compared to the Flippy. These include the following comments:



"problem is the 'pillow pad' is a ripoff of the Flippy and if you look at the reviews it's [*sic.*] quality is poorer and the original which makes sense since it's a ripoff and cheaper.."



"I bought a flippy 2+ years ago, and at that time it was only one of it's kind [*sic.*] on Amazon and $50. . . . I do think the flippy is a lot firmer than the pillow pad, and perhaps heavier."



"I'm between this [Pillow Pad] and the Flippy, but Flippy has better reviews on Amazon and looks way better. I think I'll pay $5 for a better made pillow.  Flippy also looks better on videos."

103.    Numerous Amazon reviews of Ontel's Pillow Pad product also criticized its

inferior quality as compared to Flippy.  For example:



"I bought this for my husband.  It came earlier today. . . . Once opened, it was not recognizable as compared to illustration on line. . . . It was unusable.  I am returning it.  And will have to pay more for a Flippy or look locally for one that actually looks and functions as a tablet pillow."



"I have a Flippy brand iPad pillow.  It's a great product but it's a little pricey so I purchased this product for a second room.  This is a piece of junk.  Please just don't buy one.  I returned it the next day.  Amazon says it's a 'frequently returned item. Haha.  That should tell you all you need to know about it."

 kitser's mom

⭐☆☆☆☆ **Not the iPad pillow I was looking for**
Reviewed in the United States on December 17, 2023
Color: Burgundy | Style: Ultra | Verified Purchase

I had previously had a flippy which I loved. I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder. I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube. So I shoved it back in and I'm returning it. I will have to pay more for a real flippy, but I'm willing to do it.

> "I had previously had a flippy which I loved. I was shocked when this one came to my door and was rolled up and shoved in a plastic tube holder. I took it out as it said to do and let it sit out for five hours, and it still look like it was just taken out of the tube. So I shoved it back in and I'm returning it. I will have to pay more for a real flippy, but I'm willing to do it."

 hiyabuddy

⭐⭐☆☆☆ **Cheap Knock off of FLIPY**
Reviewed in the United States on March 22, 2023
Color: Blue | Style: Ultra | Verified Purchase

This is no where near as good as a flipy. I actually feel my search misled me to this one but live and learn. I ended up cutting a piece of cardboard to tuck inside on the bottom. It's two days later and it's still sorta sad and not taking shape. I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my cardboard hack this would sorta cave under the weight when picked up with one hand as I can with my good one. Honestly not worth my time to return. Trust my advice spend the extra 15 and get the real one.

> "This is no where near as good as a flipy. I actually feel my search misled me to this one but live and learn. . . . I have a flipy and it's wayyyy more solid and easy to move around with the iPad on it. If not for my cardboard hack this would sorta cave under the weight when picked up with one hand . . . . Honestly not worth my time to return. Trust my advice spend the extra 15 and get the real one."

 Barbara

⭐☆☆☆☆ **Cheap knock off.**
Reviewed in the United States on December 9, 2021
Color: Charcoal Grey | Style: Ultra | Verified Purchase

This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered. It's a little lopsided and badly wrinkled. It's hollow in the middle and the foam is split on one side. I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing. Since then, bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality.

> "This pillow came rolled up tight in a skinny little box.. many days ago.. it still hasn't recovered. It's a little lopsided and badly wrinkled. It's hollow in the middle and the foam is split on one side. I bought it because it cost less that the Flippy brand pillow and they made it look nice like the Flippy in the listing. Since then, I bought a real Flippy tablet pillow and it didn't come rolled and squashed and is very nice quality."

104.    In March 2019, Ontel listed the Pillow Pad in its catalog at the housewares show in Chicago that same month.

105.    After receiving emails from HPI's CEO in March and April 2019, without any license from HPI, Ontel continued and/or began to develop, import, advertise, distribute, offer for sale, and sell its Pillow Pad products.[1]

106.    Through December 2020, Ontel's Pillow Pad product was advertised on TV by Ontel, with almost 4000 airings of 4 different commercials through December 2020.

107.    On information and belief, Ontel spent at least approximately $2 million on television advertising / media for its Pillow Pad product, which ranked as a top-50 product based on advertising spend in the year starting in September 2019—after its commercials had already been airing for about six months.

108.    Among other sales channels, Ontel initially sold its Pillow Pad product on a direct sales website created and run by Ontel.

109.    During this same time, Ontel's Pillow Pad product was also offered for sale by Ontel via Amazon and through various retailers, online and/or in their physical stores.

110.    Following the issuance of the '479 patent in March 2021, Ontel's knock-off Pillow Pad product has been sold primarily by retailers and other third parties, including each of the Defendants.

111.    On information and belief, Ontel agreed to indemnify many of the retailers who sold and/or are selling the knock-off Pillow Pad product against certain claims of patent and/or other intellectual property infringement, including each of the Defendants.

## RETAILERS SELL ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT INSTEAD OF FLIPPY

112.    On the basis of the QVC sellout, Juliette reached out to the buyer at Bed, Bath and Beyond ("BBB") in January 2019 in an effort to place Flippy in BBB retail channels.  Juliette explained that the Flippy product was patented, had sold out on QVC, and enjoyed consistent 5-

---

[1] On May 10, 2019, Ontel first used the name "Pillow Pad" in commerce.

star reviews.  Juliette also shared that HPI had a highly experienced team and financing in place, and was ready to add retail partners.

113.    BBB's buyer, Greg Rosenthal, responded tersely via email, stating "we would not bring in that product."

114.    When Juliette followed up, asking if there were other buyers at BBB who would be more appropriate, Greg Rosenthal confirmed "[N]o, this would fall in my area."

115.    On information and belief, BBB had an ongoing relationship with Ontel and had served as a retail outlet for a number of "As Seen on TV" products supplied by Ontel.

116.    BBB was another prominent company based in northern New Jersey, with its headquarters in Union, a mere 20 miles or so away from the Fairfield headquarters of Ontel and Telebrands.

117.    In less than 6 months after stating that "we would not bring in that product" to Juliette, the knock-off Pillow Pad product supplied by Ontel was, on information and belief, in BBB stores across the USA.

118.    A picture of Ontel's Pillow Pad product on the shelves at a BBB retail location on or about July 19, 2019, is shown below:



119.    Ontel's knock-off Pillow Pad product was a multi-year retail success for BBB. Even as BBB was closing, the Pillow Pad was one of the last products still sold in stores and online.

120.    The experience with BBB is illustrative of how the growth trajectory for HPI—especially through the retail sales channel—was quickly eclipsed by the immediate launch of the knock-off Pillow Pad product, consistent with Ontel's knock-off business model.

121.    On information and belief, at that time Ontel had similar arrangements and similar plans in the works with a number of other retailers.  On information and belief, these arrangements encompassed Defendants BJ's and Boscov's by no later than May 2023, and included UBS by no later than October 2023.

122.    Ontel's knock-off Pillow Pad product began to show up on retail shelves across the nation in or around July 2019.  At this time, Juliette Fassett personally found Ontel's knock-off Pillow Pad product being sold at BBB and in Walmart retail locations.

123.    In September 2019, Juliette Fassett found Ontel's knock-off Pillow Pad product for sale at her local Kroger store, Fred Meyer.  A number of Juliette's friends, familiar with Flippy, contacted her with congratulatory messages that they were pleased to see "Flippy" being sold on the shelves.

124.    Even these friends—who were familiar with Juliette and her years of developing Flippy, and at least some of whom had actual Flippy tablet stands—were confused about the source of Ontel's knock-off Pillow Pad product that they saw on the shelves at Fred Meyer, conflating it with HPI's innovative Flippy.

125.    Even when Josh Malone, the inventor of Bunch O Balloons, posted on his LinkedIn page about Ontel (and Walmart) knocking off Juliette's innovative Flippy tablet stand, one of the commenters congratulated Juliette for a great idea after having seen what he thought was her original Flippy product on the shelves at Fred Meyer—when it was actually Ontel's knock-off Pillow Pad product that was being sold and offered for sale at Fred Meyer.





126.    By the end of 2019, Ontel's knock-off Pillow Pad product was in retail locations including at least Defendants BJ's and Boscov's, as well as Walgreens, Target, Walmart, Big Lots, Joann's Stores, Lowe's, BBB, and Meijer.

127.    Ontel's knock-off Pillow Pad product was also being sold online from a number of the retailers' respective websites (including those of BBB, Target, and Walmart), as well as Amazon and the various direct-sales website that Ontel had created for its knock-off Pillow Pad product.

128.    In addition to being blocked from expanding into retail channels because Ontel's knock-off Pillow Pad product was so quickly ensconced across the channel, HPI's successful Amazon and QVC sales channels soon faltered.

129.    On November 22, 2019, Juliette received a return notification from Amazon from a Flippy customer, who indicated that "There is an item almost identical to this being sold at Lowes for $15 cheaper." On information and belief, Lowe's was at least offering for sale Ontel's knock-off Pillow Pad product as of that date.

130.    On New Year's Eve, December 31, 2019, the QVC buyer sent Juliette an email with a photo of the knock-off Pillow Pad being sold at a Walmart location in Boothwyn, PA:



131.    The QVC buyer's email stated:

Hi Juliette,

Stumbled upon this at Walmart.  Is this the competitor we've been discussing for the last year now?  Can you update us on the legal standings?

Thanks

132.    That saturation of retail channels by Ontel's inferior quality and lower-priced Pillow Pad product was the beginning of Flippy's demise.  As Ontel's knock-off Pillow Pad product advertised head-to-head with Flippy on Amazon and also sold widely in a variety of retail channels, sales of Ontel's knock-off Pillow Pad eclipsed those of Flippy, and consumers who purchased Ontel's knock-off Pillow Pad continued to confuse and conflate it with Flippy.

133.    Even in response to a Facebook post on Flippy's page in September of 2020, a number of people responded with comments indicating that they had actually purchased a Pillow Pad instead, such as Linda Zary, who thought that she purchased a Flippy at Walmart—which never stocked Flippy, and instead had (and still serves as a seller of) Ontel's knock-off Pillow Pad product:



134.     Two other people commented in response, each that theirs is "called pillow pad," demonstrating actual confusion of Ontel's knock-off with HPI's high-quality innovative product:

**Flippy's Post**



135.     Ontel's knock-off product, price-undercutting efforts, and deliberately confusing advertising blocked the forward trajectory of Flippy, destroying the market and freezing any potential monetization of HPI's innovation.  HPI's QVC sales immediately tanked and its Amazon sales softened as Ontel undercut HPI with a cheap, inferior-quality knock-off product that saturated the category in every sales channel.

136.     As Ontel's knock-off Pillow Pad product remained for sale in retail locations, including each of the Defendants at various times, at prices calculated to undercut HPI's sales, Flippy sales suffered tremendously:  From 2018 sales of $682,000 and 2019 sales of over $6.9 million, Flippy's 2020 sales decreased to $4.3 million, and they continued to decline to $3.277 million in 2021, $1.5 million in 2022, and $1.0 million in 2023.

137.　At least as of May 27, 2023, Boscov's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date:



138.　On June 2, 2023, HPI provided actual notice, via email from its outside counsel, to Boscov's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

139.　At least as of May 27, 2023, BJ's was continuing to sell and offer for sale, at least online, Ontel's knock-off Pillow Pad product, as evidenced by the screenshot below taken on that date, which indicated that the Pillow Pad was out of stock at that moment:



140. On June 16, 2023, HPI provided actual notice, via email from its outside counsel, to Defendant BJ's that its sales and offers for sale of Ontel's Pillow Pad products infringed the '479 patent.

141. Defendant UBS has been on at least constructive notice of HPI's contention that its sales and offers for sale of Ontel's Pillow Pad products have infringed the '479 patent since no later than the filing of the original Complaint in HPI's lawsuit against Ontel (which previously included each of these Defendants) on October 15, 2024.

142. Defendant UBS has been on actual notice of HPI's contention that its sales and offers for sale of Ontel's Pillow Pad products have infringed the '479 patent since no later than the October 23, 2024, service of the Complaint in that lawsuit on UBS.

143. At least as of around October 25, 2023, Defendant UBS was continuing to sell and offer for sale, at least via its website, Ontel's knock-off Pillow Pad product, as evidenced by the packing list dated October 25, 2023, for an order of an Ontel knock-off Pillow Pad delivered to Juliette around that date:

| | | | PACKING LIST | | | DATE: 10/25/2023 | DH6H |
|---|---|---|---|---|---|---|---|
| STORE ADDRESS: | 25562/25562 | | | | | | PAGE: 1 |
| | UNBEATABLESALE.COM, INC. | | | | | | |
| | 195 LEHIGH AVE STE 5 | | | | | | |
| | LAKEWOOD NJ 087014555 | | | | | | |
| | 888-657-8436 | | | | | | |

| SHIPPING NUMBER: | 8098332557298 | EXTRACT DATE: | 10/25/2023 | BOX NUMBER: | 452980079871 | | |
|---|---|---|---|---|---|---|---|
| SHIPPING CONDITION: | PARCEL TO CUSTOMER | | | | | | |
| CUSTOMER PO #: | 12997331 | ORDER NUMBER: | 12997331 | | | RSC FILL CODE: | I |
| DELIVERY ADDRESS: | JULIETTE FASSETT | | | SHIP METHOD: | FEDEX GROUND | | |
| | 222 SW TEXAS ST | | | | | | |
| | PORTLAND OR 97219 | | | | | | |

| ITEM NUMBER | ITEM DESCRIPTION | MANUFACTURER NUMBER | TOTAL UNITS ORDERED | UNITS FILLED IN BOX | FILL PACK | UNIT OF MEASURE | COMMENTS |
|---|---|---|---|---|---|---|---|
| 6001426 | TABLET HOLDER ASST 1PK | PPADG-CD4 | 1 | 1 | U001 | | |
| PO #: 12997331 | | | | | | | |

| | | | TOTALS: | 1 | 1 | | |
|---|---|---|---|---|---|---|---|

*********** END OF REPORT PACKING LIST ***********

IN THE EVENT OF ANY QUESTIONS OR PROBLEMS WITH YOUR ORDER,
PLEASE CONTACT         UNBEATABLESALE.COM, INC.
WHERE YOUR ORDER WAS PLACED.

144.    As an example of HPI's declining sales and price erosion due to Ontel's knock-off Pillow Pad product, non-party Ollie's Discount Outlets ("Ollie's") made Juliette an initial low-ball offer of $3/unit in October 2023 in response to September 27, 2023, email correspondence from Juliette.

145.    Ollie's buyer, Jonathan Lampert, elaborated on the rationale behind the low-ball offer in an email sent to Juliette on October 13, 2023: "I know this is way below your cost/handling/etc.  Unfortunately, the price bar was set very low with the excess we bought before.  $3.00 is actually double what we paid them."

146.    On information and belief, Mr. Lampert's use of "the excess we bought before" and "what we paid them" referred to Ontel and its knock-off Pillow Pad products.[2]

---

[2] On information and belief, Ollie's was offering for sale and selling Ontel's knock-off Pillow Pad products from its physical retail locations at least as of May 2023.

147.    After making substantial progress on a purchase agreement through early December 2023, and sending HPI a purchase agreement on December 5, 2023, Ollie's ultimately declined to take a license or purchase the Flippy from HPI just one week later.

148.    But for Ontel's provision and advertising of its knock-off Pillow Pad product—including through its retail partners, including but not limited to the Defendants—HPI was ready and poised to move into big box retailers and their physical and online sales channels.  Even beyond Juliette's own decades of experience as a wholesale product developer and seller who has been selling into retail channels her entire career, HPI was set up with connected and experienced partners for warehousing, end-to-end logistics, and oversight for manufacturing in China.   HPI also had an experienced CFO and a network of investors and advisors who were ready and willing to assist with using the momentum from the QVC sellout to see HPI through to providing Flippy to physical retail locations.

**AMAZON REMOVES ONTEL'S KNOCK-OFF PILLOW PAD PRODUCT**

149.    On April 1, 2021, HPI filed a complaint with Amazon's Utility Patent Neutral Evaluation ("UPNE") program in an effort to get Ontel's knock-off Pillow Pad product removed from Amazon's listings for infringing the '479 patent.[3]

150.    As shown in the attached **Exhibit D**, Ontel's knock-off Pillow pad product infringes at least claim 12 of the '479 patent.

151.    On information and belief, Amazon provided notice of the UPNE process to Ontel in or about April 2021.

152.    In May 2021, Ontel declined to participate in the UPNE process, in which a neutral evaluator was to determine HPI's likelihood of proving that Ontel's Pillow Pad product infringed the '479 patent.

---

[3] At this time, UPNE was in the midst of a three-year beta testing period that began in 2019.  UPNE officially concluded its beta version in 2022 when Amazon formally launched a substantially identical program that it branded as Amazon Patent Evaluation Express ("APEX").

153.    On information and belief, Ontel declined to participate in the UPNE process because it had no real defense to HPI's infringement allegations, and wanted to avoid any record of contesting infringement and losing.

154.    Following Ontel's non-participation in Amazon's UPNE and failure to file a declaratory judgment action against HPI, Ontel's knock-off Pillow Pad product was removed from the Amazon platform in June 2021.

155.    In response, Ontel created a substantially similar version of its knock-off Pillow Pad product —having only two rounded edges instead of the three rounded edges that the first knock-off version copied from Flippy—for sale on Amazon, Walmart.com, and on information and belief, through other retail channels, including via Defendants.

## COUNT I

### (Direct Infringement of the '479 patent)

156.    Plaintiff incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

157.    Each of the Defendants has infringed under 35 U.S.C. § 271(a) at least claim 1 of the '479 patent (which is identical to claim 1 of the '454 patent) by selling and/or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority.

158.    Each of the Defendants has infringed under 35 U.S.C. § 271(a) at least claim 12 of the '479 patent by selling and/or offering for sale Accused Products (including the Pillow Pad and equivalent products) in the United States without license or authority on or after March 23, 2021.

159.    The direct infringement of the '479 patent by each of the Defendants has damaged Plaintiff by violating Plaintiff's right to exclude others from importing into and making, using, selling, and offering to sell covered products in the United States.

160.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because Boscov's had actual knowledge of the '479

patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 2, 2023, the infringement of the '479 patent by Boscov's has been willful since no later than that date.

161.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because BJ's had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by June 16, 2023, infringement of the '479 patent by BJ's has been willful since no later than that date.

162.    Because the Pillow Pad meets each limitation of at least claim 12 of the '479 patent in the manner shown above, and because UBS had actual knowledge of the '479 patent and its infringement by sales and offers for sale of Ontel's knock-off Pillow Pad product by October 23, 2024, infringement of the '479 patent by UBS has been willful since no later than that date.

163.    The actions of each Defendant, including their low pricing of the inferior-quality Pillow Pad, have caused HPI to lose sales of the Flippy products with consequent loss of profits.

## COUNT II

### Trade Dress Infringement under the Lanham Act

164.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

165.    Plaintiff developed and has used the distinctive design of its Flippy media stand, including in particular its soft fabric cover and the rounded ledges between each back support and the next edge support, which are reflected in registered trademark No. 7,437,967 awarded by the USPTO to Plaintiff in 2024.  These distinctive features of the Flippy design can be seen above in paragraphs 120–21 and 129, and are referred to here as the Flippy Trade Dress.

166.    Plaintiff is the owner of all right and title to the Flippy Trade Dress.

167.    The Flippy Trade Dress and particularly the rounded ledges, at specific levels of roundedness, are distinctive of the Flippy.  The rounded ledges are not functional, as they are not

essential to the use or purpose of the Flippy pillow, and do not affect the cost or quality of the item.

168.    The Flippy's distinctive rounded ledges also have acquired secondary meaning. Plaintiff has exclusively used this trade dress since 2013 (almost 6 years of exclusive use before Ontel came to market with the infringing Pillow Pad).  During that time, Plaintiff made significant sales and there were no other similar products on the market.  On information and belief, consumers came to associate this trade dress with the Flippy.

169.    Since Ontel's product came to market, there have been numerous instances of actual confusion where consumers bought Ontel's product believing it to be the Flippy, as evidenced by purchasers of the Ontel product complaining about it to Plaintiff HPI.

170.    On information and belief, Ontel copied the Flippy including the distinctive Trade Dress of HPI's Flippy in order to create a likelihood of confusion between the Pillow Pad and HPI's original Flippy, and continues to copy the distinctive Trade Dress of HPI's Flippy.

171.    Ontel and the Defendants' use of HPI's Trade Dress, in an attempt to advertise or promote its own Pillow Pad, misrepresents the nature, characteristics, and quality of Ontel's products, said misrepresentation creating the likelihood that the public would associate Ontel's lower-quality Pillow Pad with HPI and/or HPI's Flippy.

172.    On information and belief, Ontel and the Defendants' use of HPI's Trade Dress is and has been done in bad faith, knowingly and willfully and with the intent to confuse the relevant purchasing public.

173.    On information and belief, neither Ontel nor any of the Defendants has taken steps to prevent deception or confusion of the relevant purchasing public with respect to its marketing of the infringing Pillow Pad products.

174.    Ontel and the Defendants' unauthorized use of HPI's Trade Dress is an infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT III

### Unfair Competition Under N.J.S.A. § 56:4-1

175.    Plaintiff hereby re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

176.    Plaintiff's product is and has been sold and purchased throughout the United States, including in New Jersey.

177.    Ontel copied the Flippy, including the Flippy Trade Dress (in particular, the rounded ledges), product colors, and marketing and advertising materials, in a deliberate attempt to create confusion because consumers in the United States would assume that the Pillow Pad product sold by Ontel and Defendants was the successful and high-quality product of the Plaintiff that had been featured on QVC and garnered high reviews on Amazon.

178.    Ontel intentionally caused the Pillow Pad products to duplicate and replicate the Flippy, including the Flippy Trade Dress, and intentionally caused the advertising for the Pillow Pad products to be substantially similar to that of the Flippy, and Defendants have sold and sell the Pillow Pad in markets serving customers that would recognize Plaintiff's trade dress—including direct-to-consumer sales on Amazon and under the "As Seen on TV" brand both online and in retail stores.  Defendants have used Plaintiff's trade dress intending to profit from consumers' confusion and to capitalize on the goodwill associated with Plaintiff's product.

179.    On information and belief, Ontel's adoption of and use of confusingly similar (i.e., identical) trade dress for its Pillow Pad as for Flippy, as described above, allows Defendants to receive the benefit of Plaintiff's goodwill, which Plaintiff established at great labor and expense.

180.    On information and belief, and through the acts described above, in the course of conducting business, each Defendant conspired and/or collaborated at least with Ontel to knowingly engage in unfair acts and/or practices and unfair methods of competition, including but not limited to using designs and trade dress identical and/or confusingly similar to the Flippy, and otherwise engaged in deceptive trade practices.

HPI V. NJ RETAILERS COMPLAINT

181.    The acts of Defendants complained of herein were committed willfully and maliciously, and for the purpose of their own economic benefit at the expense of Plaintiff's rights, monetary gain, and success in business.

182.    The acts of Defendants complained of herein constitute unfair competition in violation of the New Jersey Unfair Competition Statute, N.J.S.A. § 56:4-1.

183.    As a result of the Defendants' actions,  Defendants have been and are being unjustly enriched—and Plaintiff has been harmed and has suffered injury and is being harmed and is continuing to suffer injury, including loss of revenues, increased expenses, and missed business opportunities—in amounts to be determined at trial.

184.    Unless enjoined by this Court, Defendants' wrongful acts will continue and Plaintiff will continue to suffer irreparable harm for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HPI respectfully requests that the Court enter judgment in favor of HPI and against Defendants as follows:

A.  Finding that Defendants have each infringed the '479 patent;

B.  Issuing a permanent injunction that prohibits each Defendant, and its respective affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them, from infringing the '479 patent;

C.  Requiring that each Defendant renders a full and complete accounting to Plaintiff for each of their profits, gains, advantages or the value of business opportunities received from its respective sales of Ontel's Pillow Pad products;

D.  Requiring that each Defendant pays Plaintiff damages sufficient to compensate Plaintiff for its respective infringements of the '479 patent, including lost profits suffered by Plaintiff as a result of their respective infringements and in an amount not less than a reasonably royalty;

E.  Finding the case exceptional under 35 U.S.C. § 285 and requiring that Defendants pay to Plaintiff all of its attorneys' fees and costs and expenses in this action;

F.  Finding that Flippy's signature rounded ledges constitute distinctive trade dress;

G.  Finding that each Defendant has infringed Plaintiff's trade dress;

H.  For each violation of the Lanham Act, each Defendant's profits pursuant to 15 U.S.C. § 1117(a);

I.  For each violation of the Lanham Act, Plaintiff's damages sustained pursuant to 15 U.S.C. § 1117(a);

J.  The costs of this action, pursuant to 15 U.S.C. § 1117(a);

K.  Finding that each Defendant has competed unfairly with Plaintiff.

L.  For the New Jersey statutory claim, Plaintiff's lost profits;

M.  For the New Jersey statutory claim, Defendants' unjust enrichment;

N.  For violations of N.J.S.A. § 56:4-1, punitive damages, treble damages, and injunctive relief pursuant to N.J.S.A § 56:4-2;

O.  Awarding Plaintiff prejudgment interest, post-judgment interest, and costs; and

P.  Such other and further relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all issues raised by this Complaint that are properly triable by a jury.

Dated: June 20, 2025

*/s/ Jordan B. Kaplan*
Jordan B. Kaplan
jbkaplan@foxrosthschild.com
**FOX ROTHSCHILD, LLP**
49 Market Street
Morristown, New Jersey 07960
Telephone: (973) 992-4800
Facsimile: (973) 992-9125

*Attorney for Plaintiff Happy Products, Inc.*

<u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, the undersigned attorney for Plaintiff Happy Products,

Inc., certifies that, to the best of his knowledge, the matters in controversy is related to the matter

pending before the United States District Court for the District of New Jersey, captioned *Happy*

*Products, Inc. v. Ontel Products Corp.*, Civil Action Number 2:24-cv-09819-EP-JRA.


Dated: June 20, 2025

> */s/ Jordan B. Kaplan*
> Jordan B. Kaplan
> jbkaplan@foxrosthschild.com
> **FOX ROTHSCHILD, LLP**
> 49 Market Street
> Morristown, New Jersey 07960
> Telephone: (973) 992-4800
> Facsimile: (973) 992-9125
>
> *Attorney for Plaintiff Happy Products, Inc.*